UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KAREN SUE EVANS                          CIVIL ACTION NO. 6:15-cv-02415

VERSUS                                   JUDGE TRIMBLE

CAROLYN W. COLVIN,                       MAGISTRATE JUDGE HANNA
ACTING COMMISSIONER OF
SOCIAL SECURITY

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Karen Sue Evans, fully exhausted her administrative remedies

before filing this action in federal court.  She filed an application for disability

insurance benefits ("DIB"), alleging disability beginning on October 15, 2008,[1] which

was denied.[2]  She requested a hearing,[3] which was held on November 4, 2013 before

Administrative Law Judge Robert Grant.[4]  The ALJ issued a decision on March 10,

---

[1]     Rec. Doc. 7-1 at 86.

[2]     Rec. Doc. 7-1 at 40.

[3]     Rec. Doc. 7-1 at 53.

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 23-39.

2014,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from October 15, 2008 through December 31, 2011, the date she was last insured for Social Security benefits.   The claimant asked for review of the decision, but the Appeals Council denied her request.[6]   Therefore, the ALJ's ruling became the final decision of the Commissioner for the purpose of this Court's review pursuant to 42 U.S.C. § 405(g).   The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on December 5, 1952.[7]   At the time of the ALJ's decision, she was sixty-one years old.   She graduated from high school and has an associate's degree in medical science.[8]   She has past relevant work experience as a medical assistant, as a thermal scan technician in a wellness clinic, as a laser technician in a skin care clinic, and as an automobile sales person.[9]   She alleges that

---

[5]      Rec. Doc. 7-1 at 14-19.

[6]      Rec. Doc. 7-1 at 4.

[7]      Rec. Doc. 7-1 at 26, 41.

[8]      Rec. Doc. 7-1 at 29.

[9]      Rec. Doc. 7-1 at 137, 145.

she has been disabled since October 15, 2008 due to osteoarthritis, fibromyalgia, chronic fatigue, and anxiety.[10]

Although the claimant alleges a disability onset date in October 2008, the record contains no treatment notes or other documentation of any medical problem she might have had on or before that date aside from the history that she gave to her physicians thereafter.  The claimant's primary care physician appears to be Dr. Craig H. Greene, a family practice physician in Opelousas, Louisiana, with whom she treated from 2009 through 2013.  The earliest treatment note in the record documents the claimant's first visit with Dr. Greene, on June 9, 2009,[11] more than six months after her alleged disability onset date.   At that visit, she reported a history of hypothyroidism.  She was taking Synthroid, Xanax, and Zyrtec.  Dr. Greene noted that she had previously been evaluated by a neurologist for possible multiple sclerosis.  He stated that he would get the records and follow up.  However, the record contains no medical records or other documents from any neurologist.

Ms. Evans saw Dr. Greene on June 24, 2009, July 17, 2009, and July 27, 2009 for urinary tract infections.[12]  She then consulted Dr. Lee D. Ellender on August 11,

---

[10]     Rec. Doc. 7-1 at 41, 136.

[11]     Rec. Doc. 7-1 at 232-233.

[12]     Rec. Doc. 7-1 at 226-231.

2009 with regard to a urinary tract infection.[13]   On October 12, 2009, October 15, 2009, and October 27, 2009, the claimant saw Dr. Greene because of vaginitis.[14]

On November 19, 2009,[15] the claimant went to the emergency room at Opelousas General Hospital, complaining of a headache.  It was noted that she had undergone a spinal tap three days earlier to rule out muscular dystrophy and was seeking to obtain a "blood patch."  The claimant left without treatment, stating that she was going to go to Our Lady of Lourdes Hospital instead.  The hospital record mentions Dr. Lugo, but it contains no evidence of a visit to Our Lady of Lourdes and no records from Dr. Lugo.

On December 10, 2009, the claimant again saw Dr. Greene for a urinary tract infection.[16] On January 28, 2010,[17] the claimant complained to Dr. Greene of extreme fatigue that had lasted for about a week.  Dr. Greene suspected mononucleosis, indicating that he would do lab work in one week if needed.  His legible clinical impressions were fibromyalgia, hypothyroidism, anxiety, fatigue, and osteoporosis.

---

[13]      Rec. Doc. 7-1 at 195.

[14]      Rec. Doc. 7-1 at 220-225.

[15]      Rec. Doc. 7-1 at 280-283.

[16]      Rec. Doc. 7-1 at 218-219.

[17]      Rec. Doc. 7-1 at 193-194.

-4-

Ms. Evans had a normal mammogram on March 12, 2010.[18]

On April 28, 2010,[19] she saw Dr. Greene, complaining of gall bladder trouble, but diagnostic testing revealed a normal gall bladder.

The very next day, the claimant presented at the emergency room at Opelousas General Hospital[20] with complaints of back and flank pain.  She reported that Dr. Greene had recently diagnosed her with mononucleosis.  CT scans of her pelvis and abdomen were performed, which revealed scattered diverticula involving the descending and sigmoid colon with mild pericolonic infiltration indicative of mild diverticulitis as well as degenerative changes involving the lower lumbar spine with facet osteoarthropathy.  She was diagnosed with diverticulitis and lumbrosacral radiculopathy and given Toradol for pain.  She was discharged with prescriptions for Cipro and Mobic.

The claimant returned to Dr. Greene on May 13, 2010,[21] complaining of itching on the right side of her chest after picking dewberries in poison ivy, complaining of moles possibly having changed shape, and complaining of her right breast feeling

---

[18]     Rec. Doc. 7-1 at 279.

[19]     Rec. Doc. 7-1 at 191-192, 277-278.

[20]     Rec. Doc. 7-1 at 267-276.

[21]     Rec. Doc. 7-1 at 189-190.

-5-

inflamed.  On June 10, 2010,[22] she complained to Dr. Greene of itching, sweating, anxiety, and vaginosis.  She returned to Dr. Greene on August 19, 2010[23] to have a mole on her back removed and seeking a prescription for weight loss drug Adipex. Among the clinical impressions was abdominal mass.  The next day, an abdominal CT scan was performed, which showed no evidence of an upper abdominal mass or abnormal fluid collection.[24]

Ms. Evans returned to Dr. Green on September 27, 2010,[25] for an obesity and endocrine follow up visit, with chief complaints of obesity, fatigue, and malabsorption.  The record indicates that she weighed 154.2 pounds on August 10, weighed 149.2 pounds on September 10, and had a goal weight of 145 pounds.

On October 22, 2010,[26] the claimant saw Dr. Ellender, complaining of a sharp pain behind her right ear.  She was diagnosed with pharyngitis, sinusitis, otitis media, and congestion.

---

[22]     Rec. Doc. 7-1 at 187-188.

[23]     Rec. Doc. 7-1 at 185-186.

[24]     Rec. Doc. 7-1 at 266.

[25]     Rec. Doc. 7-1 at 183-184.

[26]     Rec. Doc. 7-1 at 182.

The claimant returned to Dr. Green on December 14, 2010,[27] requesting to have her blood sugar checked.  Dr. Greene noted that she appeared tired.  His legible clinical impressions were fatigue and sinusitis.

On January 27, 2011,[28] the claimant saw Dr. Glynn Granger at the Opelousas General Health System.  His legible impressions were recurrent constipation, change in bowel habits, hypercholesterol, and hypothyroidism.

On February 9, 2011,[29] the claimant's abdomen was x-rayed, revealing degenerative changes in the lower lumbar spine and constipation.  A chest x-ray, taken the same date, revealed no active chest disease.[30]

On February 11, 2011,[31] the claimant saw Dr. Granger at Opelousas General Hospital, who performed an esophagogastroduodenoscopy with biopsies and CLO-test of the antral portion of the stomach and biopsies of the esophagus on the esophageal side of the esophagogastric junction.  Dr. Granger's diagnoses were erosive antral gastritis with antral ulcerations, gastroesophageal reflux disease,

---

[27]     Rec. Doc. 7-1 at 216-217.

[28]     Rec. Doc. 7-1 at 254-255.

[29]     Rec. Doc. 7-1 at 264.

[30]     Rec. Doc.  7-1 at 263.

[31]     Rec. Doc. 7-1 at 250-253, 256-262.

hypercholesterolemia, hypothyroidism, and sleep apnea.  A colonoscopy with biopsies was performed the same day, which showed nonspecific colitis.

On March 15, 2011,[32] Ms. Evans saw Dr. Bogard in Dr. Greene's office, requesting referral to a rheumatologist.  The claimant gave a history of rheumatoid arthritis in the past.  Dr. Bogard's impressions were hypothyroidism, hyperlipodemia, fibromyalgia, and anxiety.  He referred her to a rheumatologist to rule out lupus.

The claimant again saw Dr. Bogard on April 29, 2011,[33] and he diagnosed her with a urinary tract infection.

On May 10, 2011 and again on May 18, 2011, Ms. Evans saw Dr. Jennifer Malin of the Lafayette Arthritis and Endocrine Clinic, in Lafayette, Louisiana.[34]  The treatment notes are largely illegible but contain references to osteoarthritis.

The claimant saw Dr. Bogard again on May 26, 2011,[35] complaining of a skin rash and a decreased sense of smell.  She told Dr. Bogard that Dr. Malin had diagnosed her with osteoarthritis and costochondritis, given her a Kenalog injection, and prescribed Vitamin D.  She said she was to follow up with Dr. Malin in one year.

---

[32]      Rec. Doc. 7-1 at 214-215.

[33]      Rec. Doc. 7-1 at 212-213.

[34]      Rec. Doc. 7-1 at 197-198.

[35]      Rec. Doc. 7-1 at 210-211.

-8-

Dr. Bogard diagnosed the skin rash as exposure to poison sumac and prescribed Depo Medrol.  He also prescribed Mobic.[36]

On July 11, 2011, the claimant saw a nurse practitioner in Dr. Greene's office.[37] She complained of bladder cramps and low abdominal pain and stated that Mobic was not working for her arthritis pain.  She was given Toradol.

Ms. Evans returned to Dr. Greene's office on September 30, 2011,[38] complaining of fatigue and reporting that "it feels like mono again."  The clinical impressions were acute allergic rhinitis, acute viral syndrome, malabsorption, fatigue, hypothyroidism, and osteoarthritis.  She was given a B12 injection and prescribed Zyrtec.

She returned to Dr. Greene's office on October 24, 2011 complaining of frequent burning urination.[39]  She was diagnosed with a urinary tract infection, and Bactrim and Pyridium were prescribed.

---

[36]     The generic form of Mobic is Meloxicam, and these medications are nonsteroidal anti-inflammatory drugs, often prescribed for arthritis pain.   WebMD, http://www.webmd.com/drugs/2/drug-18173/mobic-oral/details, last visited August 18, 2016.

[37]     Rec. Doc. 7-1 at 208-209.

[38]     Rec. Doc. 7-1 at 206-207.

[39]     Rec. Doc. 7-1 at 204-205.

The claimant returned to Dr. Greene's office for a follow up visit on November 8, 2011.[40]  At that time, she complained of sinus trouble and was again diagnosed with a urinary tract infection.  Cipro and Xyzal were prescribed.

On December 28, 2011, the claimant was again seen in Dr. Greene's office.[41]  Her chief complaint was anxiety, but she reported that she felt better since being on Zoloft.  The clinical impression was generalized anxiety disorder.  She was given a B12 injection and prescribed Zoloft.

On January 24, 2012, the claimant was seen in the emergency room of Opelousas General Hospital, complaining of abdominal pain.[42]  She was diagnosed with acute and chronic gastritis, and Nexium was prescribed.

On May 11, 2012, diagnostic testing showed degenerative changes of the left foot, including a prominent bone spur, and mild degenerative changes to the right foot.[43]  Diagnostic testing of the hands, performed the same day, showed mild degenerative changes in both hands.[44]

---

[40]     Rec. Doc. 7-1 at 202-203.

[41]     Rec. Doc. 7-1 at 200-201.

[42]     Rec. Doc. 7-1 at 243-249.

[43]     Rec. Doc. 7-1 at 239-240.

[44]     Rec. Doc. 7-1 at 241-242.

Ms. Evans saw Dr. Greene on May 14, 2013[45] for a consultation with regard to fibromyalgia.  He noted that Dr. Malin had ruled out fibromyalgia in May 2011. His clinical impression was osteoarthritis pain and a Heberden's node in the right hand.  Such nodes are characteristic of osteoarthritis.[46]  He continued the claimant's Mobic prescription and added Omeprazole[47] to her medication regimen.

The claimant returned to Dr. Malin's office on May 23, 2013.[48]  Her chief complaint was hand pain.  Dr. Malin noted that the claimant had increasing symptoms of fibromyalgia, including 18 of 18 fibromyalgia tender points, diffuse pain throughout her body, continued sleep disturbance, and fatigue.  Her assessment was arthralgia, fibromyalgia and myositis, osteoarthritis, and cervical disorder.  She prescribed Lyrica and daily exercise and noted that a sleep study might be needed.

On June 3, 2013, the claimant completed a disability report.[49]  In the report, she stated that she had experienced muscular pain since 2008 and was treated by Dr.

---

[45]      Rec. Doc. 7-1 at 300-301.

[46]      Arthritis    Foundation,    http://www.arthritis.org/about-arthritis/where-it-hurts/ wrist-hand-and-finger-pain/diagnosis /health-finger-nails-hands.php, last visited August 18, 2016.

[47]      This drug is prescribed to treat certain stomach and esophagus problems.  Web MD, http://www.webmd.com/drugs/2/drug-3766-2250/omeprazole-oral/omeprazole-delayed-release-tablet---oral/details, last visited August 18, 2016.

[48]      Rec. Doc. 7-1 at 285-288.

[49]      Rec. Doc. 7-1 at 156-163.

Wendy Day for low back pain.  The record contains no treatment notes or other documents from Dr. Day.  The claimant stated that she underwent MRI examinations ordered by Dr. Day that showed seven degenerated and herniated discs.  No evidence of such examinations is in the record.  The claimant stated, in the disability report, that she treated with a chiropractor and underwent physical therapy, but there are no records from any chiropractor or physical therapist in the record.  In the disability report, the claimant stated that she treated with Dr. Fabian Lugo for a lesion on her right frontal lobe.  There are no treatment notes or other documents from Dr. Lugo in the record.  In the disability report, the claimant stated that she treated with a physician in Columbus, Georgia who diagnosed her with fibromyalgia and prescribed Lyrica.  There are no medical records from any Georgia physician in the record.  In the disability report, she further stated that, since April 2013, she was unable to stand, sit, walk, or move about for more than four hours per day and was unable to work a part-time job due to muscle weakness that sometimes causes her to fall.  At the time the disability report was prepared, the claimant was taking Synthroid for hypothyroidism, Zoloft for anxiety, Omeprazole for ulcers, and Neurontin for fibromyalgia.

On November 4, 2013, the claimant testified at a hearing before ALJ Robert Grant.  She testified that she was taking Synthroid, Mobic for arthritis pain, and an anti-anxiety medication.[50]  She stated that she has bone spurs in her wrists that interfere with her ability to grip things, as well as weakness in her hands.  She also testified that she has arthritis in her feet, right knee, right hip, jaw, neck, elbows, and back.[51]  She stated that she uses a cane in public because she falls a lot and has to rest several times each day due to chronic fatigue.[52]  She stated that she must take a shower because she cannot get in and out of the bathtub.[53]  She testified that she can walk about ten minutes without taking a break, can sit or stand about ten minutes at a time, and can lift about five to seven pounds.[54]  She stated that her right leg sometimes gives out.[55]  She stated that she shops in a motorized cart at Wal-Mart, can drive short distances, does few household chores, and does no cooking.[56]  She stated

---

[50]     Rec. Doc. 7-1 at 26.

[51]     Rec. Doc. 7-1 at 26.

[52]     Rec. Doc. 7-1 at 27-28.

[53]     Rec. Doc. 7-1 at 28.

[54]     Rec. Doc. 7-1 at 32-33.

[55]     Rec. Doc. 7-1 at 33.

[56]     Rec. Doc. 7-1 at 34.

that medication relieves her anxiety[57] but her medications cause drowsiness and dizziness.[58] She complained that her memory and cognitive skills are getting worse.[59]

The claimant challenges the Commissioner's finding of nondisability.

### ANALYSIS

**A.     STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[60] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[61] Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[57]      Rec. Doc. 7-1 at 28.

[58]      Rec. Doc. 7-1 at 35.

[59]      Rec. Doc. 7-1 at 36.

[60]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[61]      *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

-14-

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[62]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[63]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[64]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[65]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[66]

---

[62]      *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[63]      42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[64]      *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[65]      *Martinez v. Chater*, 64 F.3d at 174.

[66]      *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

-15-

B.   **ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[67]   The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[68]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[69]

---

[67]   See 42 U.S.C. § 423(a).

[68]   42 U.S.C. § 1382c(a)(3)(A).

[69]   42 U.S.C. § 1382c(a)(3)(B).

-16-

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires an ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[70] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[71]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[72] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[73]  The claimant's residual functional capacity is used at the fourth step to

---

[70]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[71]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[72]     20 C.F.R. § 404.1520(a)(4).

[73]     20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[74]

The claimant bears the burden of proof on the first four steps.[75]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[76]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[77]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[78]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[79]

---

[74]      20 C.F.R. § 404.1520(e).

[75]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[76]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[77]      *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[78]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[79]      *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

D.  **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant did not engage in substantial gainful activity between her alleged onset date of October 15, 2008 and her date last insured, which was December 31, 2011.[80]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following impairments: arthritis, fatigue, anxiety, and fibromyalgia but further found that none of these impairments, individually or in combination, are severe.[81]  Having found, at step two, that the claimant is not disabled, the ALJ did not proceed through the remaining steps of the analysis.  The ALJ did not evaluate whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, did not evaluate whether the claimant can perform her past relevant work, did not evaluate whether there are other jobs that the claimant can perform, and did not evaluate the claimant's residual functional capacity.  The claimant challenges the ALJ's step two finding of no disability.

---

[80]     Rec. Doc. 7-1 at 16.

[81]     Rec. Doc. 7-1 at 16.

### E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred in four ways:  (1) in failing to find that the claimant was disabled prior to her date last insured; (2) by failing to find that the claimant was disabled for a period of time prior to her date last insured; (3) by failing to give proper weight to the opinions of the claimant's treating physician; and (4) by finding that the claimant's pain complaints were not credible.

### F.    DID THE ALJ ERR IN FAILING TO FIND THAT THE CLAIMANT DOES NOT HAVE A SEVERE IMPAIRMENT?

Although poorly articulated, the claimant appears to be contending, in her first two assignments of error, that the ALJ erred in finding that she has no severe impairments and no combination of impairments that severely affect her functionality. To evaluate whether a claimant's medical condition qualifies as a "severe impairment" at step two of the sequential analysis, the Commissioner has issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."[82] The Fifth Circuit, however, has held that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act.[83]  Therefore, in

---

[82]    20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[83]    *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985).

*Stone v. Heckler*, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe:  an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[84]   In this case, the ALJ cited the appropriate standard in his ruling, applied that standard in evaluating the evidence in the record, and reached a conclusion that is supported by substantial evidence in the record.

The impairments that the claimant contends are disabling are osteoarthritis, fibromyalgia, chronic fatigue, and anxiety.  The ALJ found that the claimant does have all four of these impairments.  With regard to the claimant's anxiety – a mental impairment – the ALJ reviewed whether this impairment results in limitations in three relevant functional categories and whether there have been episodes of decompensation.  The ALJ found that the claimant's anxiety does not limit her in any of the functional categories and further found that there have been no episodes of decompensation.  These conclusions are supported by substantial evidence in the record.  Perhaps most important, the claimant testified at the hearing that her anxiety

---

[84]     *Stone v. Heckler*, 752 F.2d at 1101.

is alleviated by medication.  A condition that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability.[85]

Furthermore, while the record contains evidence, which was discussed in the ALJ's ruling, that the claimant was diagnosed with arthritis, fibromyalgia, and fatigue prior to her date last insured, there is no evidence that, during the time period from 2008 to 2011, these impairments were severe in nature and impacted the claimant's functionality such that she was incapable of working.  Although the claimant had numerous appointments with a variety of physicians between 2009 and 2013, complaints of arthritis pain and fibromyalgia pain are relatively rare.  The record also reflects that the claimant did not consistently take medication for pain resulting from those conditions.  The record does not contain evidence from her physicians documenting the extent to which these conditions impacted her functional ability.  In sum, the claimant failed to satisfy her burden of proving the severity of these impairments, and the ALJ was correct in finding that she was not disabled.

The claimant has the burden of proof at step two of the sequential analysis, but the record is devoid of evidence establishing that the claimant had a medical condition – either physical or mental – that precluded her from working at any date

---

[85]     *Johnson v. Bowen*, 864 F.2d at 348.

before her date last insured, permanently or temporarily.  Accordingly, the ALJ's finding of no disability at step two was appropriate.

## G.  THE ALJ DID NOT ERR IN WEIGHING THE PHYSICIANS' OPINIONS

The claimant contends that the ALJ erred in weighing the opinions of the medical experts and, more particularly, erred in failing to give appropriate weight to the opinions of her treating physician.  The Social Security regulations and rulings explain how medical opinions are to be weighed.[86]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record, but the ALJ has sole responsibility for determining the claimant's disability status.[87]  Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[88]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[86]    20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[87]    *Newton v. Apfel*, 209 F.3d at 455.

[88]    *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

-23-

inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[89]

In this case, the ALJ did not give any particular amount of weight to any opinions of the claimant's treating physicians.  However, the claimant does not identify any such opinions that should have been given more weight.  The record does not contain opinions from a treating physician indicating that the claimant is disabled nor does it contain any functional analyses by any of the claimant's doctors.  This Court was unable to locate any opinions in the record that were ignored by the ALJ. While the record does contain treatment notes and testing results, these are not opinions, as that term is used in the regulations addressing medical source opinions.[90] Accordingly, the ALJ did not err in determining the weight to be assigned to the opinions of the claimant's treating physicians.

## H.   THE ALJ DID NOT ERR IN EVALUATING THE CREDIBILITY OF THE CLAIMANT'S PAIN COMPLAINTS

The claimant's final argument is that the ALJ erred in finding that her pain complaints lack credibility.  The claimant did complain of pain attributable to osteoarthritis and fibromyalgia.  However, the pain complaints and functional

---

[89]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[90]     20 C.F.R. § 404.1527(d).

limitations that the claimant testified to at the hearing do not correlate to the relevant time period.  This Court finds that the ALJ's evaluation of Ms. Evans's credibility was conducted in accordance with the required legal standards and is supported by substantial evidence in the record.

The claimant complains of pain from osteoarthritis and fibromyalgia.  It is true that pain can constitute a disabling impairment,[91] but pain is disabling only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[92]  Mild or moderate pain is not disabling.  Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[93]  While an ALJ must take into account a claimant's subjective allegations of pain in determining residual functional capacity, the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[94]  The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain does not take precedence over conflicting

---

[91]      *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

[92]      *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cri. 1990).

[93]      *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[94]      *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

-25-

medical evidence.[95]  The absence of objective factors can justify the conclusion that a witness lacks credibility.[96]

In this case, the claimant certainly has medical conditions that can cause pain. However, although the claimant saw her physicians often between 2009 and 2013, she rarely complained of pain attributable to either osteoarthritis or fibromyalgia. During that time period, she saw Dr. Malin, the arthritis specialist, only three times. After the first two visits, on May 10 and 18, 2011, she was to return in one year, but she did not return to see Dr. Malin until May 23, 2013.  The claimant stated that Dr. Malin prescribed Neurontin for her arthritis pain, but there is no treatment note from Dr. Malin substantiating that claim.  At the hearing, the functional impairments she addressed postdated her date last insured, and her alleged inability to walk for more than a few minutes at a time cannot be reconciled with Dr. Malin's recommendation that she get daily exercise.

Therefore, the ALJ's analysis of the claimant's credibility is supported by substantial evidence in the record.  When an ALJ's credibility determination is supported by substantial evidence, it is entitled to judicial deference.[97]  Having found

---

[95]      *Harper v. Sullivan*, 887 F.2d at 96.

[96]      *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008), citing *Hollis v. Bowen*, 837 F.2d at 1385.

[97]      *Villa v. Sullivan*, 895 F.2d at 1024.

that the ALJ in this case applied the proper legal standard in evaluating the claimant's credibility and having found that the ALJ's evaluation was supported by substantial evidence, this Court defers to the ALJ's credibility analysis.

### CONCLUSION AND RECOMMENDATION

The undersigned finds that the ALJ applied appropriate legal standards in ruling on this case, and the ALJ's findings are based on substantial evidence in the record.  Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **AFFIRMED** and this matter dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 22nd day of August 2016.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE